**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| ARTHUR PAPA, derivatively on behalf of AST SPACEMOBILE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ABEL AVELLAN, ANDREW JOHNSON, ADRIANA CISNEROS, LUKE IBBETSON, EDWARD KNAPP, KEITH LARSON, HIROSHI MIKITANI, RONALD RUBIN, RICHARD SARNOFF, JULIO A. TORRES, and JOHAN WIBERGH<br>Defendants,<br><br>and<br><br>AST SPACEMOBILE, INC.,<br>Nominal Defendant. | Case No.: 7:26-cv-00430<br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Arthur Papa ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant AST SpaceMobile, Inc. ("AST SpaceMobile" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Abel Avellan ("Avellan"), Andrew Johnson ("Johnson"), Adriana Cisneros ("Cisneros"), Luke Ibbetson ("Ibbetson"), Edward Knapp ("Knapp"), Keith Larson ("Larson"), Hiroshi Mikitani ("Mikitani"), Ronald Rubin

("Rubin"), Richard Sarnoff ("Sarnoff"), Julio A. Torres ("Torres"), and Johan Wibergh ("Wibergh") (the "Individual Defendants," and collectively with AST SpaceMobile, "Defendants") for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of AST SpaceMobile, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Section 10(b) and Section 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AST SpaceMobile, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by AST SpaceMobile's controlling shareholder, directors and officers from March 3, 2025, through July 15, 2026, both dates inclusive (the "Relevant Period").

2. AST SpaceMobile is a satellite telecommunications company developing the SpaceMobile Service— the first space-based cellular broadband network directly accessible to smartphones.

3. The SpaceMobile Service will be provided by a constellation of the Company's large phase-array BlueBird ("BB") satellites and use of low and mid-band spectrum controlled by mobile network operators. The Company intends to bring cellular broadband service to end-users who are out of terrestrial[1] cellular coverage without the need to directly subscribe to the SpaceMobile service and without modification to their devices. When users enter into an area outside of cellular service, they will be prompted to access the SpaceMobile Service. Additionally, the Company intends for users to have the ability to purchase a SpaceMobile Service plan directly with their existing mobile provider.

4. The SpaceMobile Service is not yet fully operational, as such it has not generated revenue. However, the Company has recognized revenue from the completion of performance obligations in contracts with the U.S. Government and contractors utilizing its initial BB satellites. Additionally, another source of revenue for the Company has come through the sale of its gateway equipment, software, and services related to mobile service providers.

5. The Company is currently working to increase the number of its BB satellites it has deployed in preparation for the rollout of the SpaceMobile Service in strategic markets. Consequently, the Company has entered into numerous agreements with service providers to help facilitate the development, manufacturing, and deployment of additional BB satellites.

6. Throughout the Relevant Period, the Individual Defendants emphasized the

---

[1] Ground-based cellular networks.

Company's competitive advantages, including its cutting-edge technology and service the SpaceMobile Service is purported to provide once operational. The Individual Defendants also made repeated assurances that the Company's financial positioning was sufficient to enable the Company to meet strategic milestones.

7. However, increased market competition began to cast doubt on the Company's competitive positioning. On September 8, 2025, the telecommunications company EchoStar Corporation ("EchoStar") announced the sale of its AWS-4 and H-block spectrum licenses to Space Explorations Technology Corp.'s ("SpaceX"). In conjunction with this transaction, EchoStar and SpaceX entered into a long-term commercial agreement (the "EchoStar SpaceX Agreement") which would allow EchoStar's Boost Mobile subscribers to access SpaceX's next generation direct-to-cellular service provided by its subsidiary, Starlink Services, LLC ("Starlink"). SpaceX's significant satellite production capabilities and Starlink's existing satellite constellation infrastructure paired with the spectrum licenses, posed a threat to AST SpaceMobile's positioning in the direct-to-cellular market.

8. The truth began to emerge, on September 8, 2025, following the announcement of the EchoStar SpaceX Agreement. The research investment firm UBS published a report downgrading the Company's stock from a "Buy" to a "Neutral" recommendation and decreased the Company's stock price target from $62.00 to $43.00 (the "UBS Report"). In explaining the reason for this shift, the UBS Report noted increasing market competition following the EchoStar SpaceX Agreement. Specifically, noting that Starlink's positioning in the direct-to-cellular market was enhanced through the pairing new spectrum rights and its existing satellite launch capabilities.

9. On this news, the price of the Company's Class A common stock fell $3.86 or approximately 9.5%, from a closing price of $40.77 per share on September 8, 2025, to close at $36.91 per share on September 9, 2025.

10. Despite these disclosures the Individual Defendants continued to make and/or cause the Company to make false and misleading statements about the Company's prospects, competitive advantage, and financial capacity to meet its strategic milestones.

11. For example, on November 10, 2025, the Company published a press release announcing its financial performance for the third quarter of 2025 (the "Q3 2025 Press Release"). Defendant Avellan is quoted in the Q3 2025 Press Release as stating that the Company "***continues to lead the direct-to-device space-based cellular broadband industry***," and that, "***[d]uring the past few months, commercial activity has significantly accelerated, demonstrating the robust demand for our solution across the ecosystem***."[2]

12. The truth continued to emerge on January 6, 2026, when Scotiabank issued a report downgrading the Company's stock to a "Sell" recommendation and its "Sector Perform" rating to a "Sector Underperform" rating (the "Scotiabank Report"). The Scotiabank Report noted that the Company was seeing slow end user adoption in the U.S. and Japan markets and increased competition from Starlink. Additionally, the Scotiabank Report highlighted the differences in the Company's and Starlink's satellite launching capabilities noting that "it has been an ordeal for ASTS to launch seven satellites since 2017, in 2025 alone Starlink orbited 3,169 units[.]"

[2] All emphasis herein is added unless otherwise stated.

13. On this news, the price of the Company's Class A common stock fell $11.76 or approximately 12.1%, from a closing price of $97.49 per share, to a close at $85.73 per share on January 7, 2026.

14. The truth fully emerged on July 15, 2026, when the Company published a press release announcing its intent to offer a "$1.0 billion aggregate principal amount of convertible senior notes due 2034 (the 'Notes') in a private offering" (the "July 2026 Proposed Offering Press Release"). The July 2026 Proposed Offering Press Release revealed that the proceeds from the offering would be used, among other things to pursue new initiatives and "***secure additional access to orbit for its space-based cellular broadband network***," which included "***partnerships and/or acquisitions to further vertically integrate business and mitigate risks associated with third-party launch providers***." Pertinently, the July 2026 Proposed Offering Press Release further disclosed that the Company "***currently does not have any understandings or agreements with respect to an such strategic transactions***."

15. On this news, the price of the Company's Class A common stock fell $11.30 or approximately 17.0%, from a closing price of $66.31 per share on July 15, 2026, to close at $55.01 per share on July 16, 2026.

16. During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was facing slow user adoption in Japan and the U.S.;

(2) the Company's competitive advantage and positioning in the satellite direct-to-cellular market was overstated; (3) the Company lacked the sufficient capital and liquidity to meet strategic product development and business goals; and (4) consequently, the frequency at which the Company would likely require increasing its debt load and share dilution was significantly understated. As a result, the Individual Defendants' statements made throughout the Relevant Period lacked a reasonable basis at all times.

17. Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while three of the Individual Defendants engaged in improper insider sales, netting total proceeds of approximately $277.4 million.

18. In breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

19. In light of the Individual Defendants' misconduct—which has subjected the Company, its Founder, Chairman of the Board and Chief Executive Officer ("CEO") and its Chief Financial Officer ("CFO") and Chief Legal Officer ("CLO"), to a federal securities fraud class action lawsuit pending in the United States District Court for the Western District of Texas (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

20. The Company has been substantially damaged as a result of the Individual

Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

21. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of various of the directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), SEC Rule 10b-5 17 C.F.R. § 240.10b-5 promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Federal Class Action based on violations of the Exchange Act.

2. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

3. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

4. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District,

or he or she is an individual who is a citizen of Texas or who has minimum contacts with this District to justify the exercise of jurisdiction over them

5. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff**

6. Plaintiff is a current shareholder of AST SpaceMobile. Plaintiff has continuously owned AST SpaceMobile common stock at all relevant times.

**Nominal Defendant AST SpaceMobile**

7. AST SpaceMobile is a Delaware Corporation with its principal executive offices located at Midland Intl. Air & Space Port 2901 Enterprise Lane Midland, Texas 79706. AST SpaceMobile's shares are traded on the Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "ASTS."

**Defendant Avellan**

8. Defendant Avellan founded the Company and has served as the Company's CEO and as Chairman of the Board since 2021. Defendant Avellan is also a member of the Network Planning and Spectrum Committee.

9. According to the proxy statement on Schedule 14A filed with the SEC on April 28, 2026 (the "2026 Proxy Statement"), as of April 28, 2026, Defendant Avellan beneficially owned 122,301 shares of Class A common stock and 78,163,078 shares of Class C common stock,

representing 71.6% of the total voting power, thus making Defendant Avellan a controlling shareholder of AST SpaceMobile.

10. The 2026 Proxy Statement provided the following about Defendant Avellan:

> Mr. Avellan, age 55, is the Founder, Chairman, and Chief Executive Officer of AST LLC since its inception in 2017 and has served as the Company's Chairman of the Board of Directors and Chief Executive Officer since April 2021. Prior to founding the Company, Mr. Avellan served as the founder and Chief Executive Officer of Emerging Markets Communications ("EMC"), a satellite-based communications services provider to maritime and other mobility markets, from 2000 until its sale to Global Eagle Entertainment Inc. for $550.0 million in July 2016. Following the acquisition of EMC, Mr. Avellan worked as the President and Chief Strategy Officer for Global Eagle Entertainment Inc. until April 2017. Mr. Avellan has over 25 years of success in the space industry and is the co-inventor of 21 U.S. patents. He was the recipient of the Satellite Transaction of the Year award by Euroconsult in 2015, was named Satellite Teleport Executive of the Year in 2017 and in February 2024 was named a Commissioner to the ITU/UNESCO Broadband Commission for Sustainable Development. Mr. Avellan has a Bachelor's in electrical engineering from Simón Bolivar University. We believe Mr. Avellan is qualified to serve on our Board due to his expertise and years of success developing innovative space-based technologies and continually proven engineering and management acumen.

**Defendant Johnson**

11. Defendant Johnson has served as the Company's CLO since May 2024 and as the Company's CFO since June 2024. He has also served as a Company director since January 2025.

12. During the Relevant Period when prices of the Company's stock were artificially inflated before the scheme was exposed, Defendant Johnson made the following sales of the Company's Class A common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| November 26, 2025 | 10,000 | $56.00 | $560,000 |
| May 20, 2026 | 5,000 | $90.25 | $451,250 |

| | | | |
|---|---|---|---|
| June 11, 2026 | 45,809 | $93.81 | $4,297,342 |

Thus, in total, before the fraud was exposed, Defendant Johnson sold 60,809 shares of Company Class A common stock on inside information, for which he received approximately $5.3 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the schemes.

13. The 2026 Proxy Statement provided the following about Defendant Johnson:

> Mr. Johnson, age 51, has served as a member of our Board since January 2025. Mr. Johnson has served as our Chief Financial Officer since June 2024 and Chief Legal Officer since May 2024. He is an experienced business leader with over 25 years of diverse legal, financial and corporate experience across emerging markets, capital markets and international operations. Prior to joining the Company in May 2024, Mr. Johnson served as the Executive Vice President, Chief Legal Officer and Secretary since 2014, and as the Chief Corporate Development Officer since September 2022 of 3D Systems Corporation, a publicly traded company that provides comprehensive 3D printing solutions in the industrial and healthcare segments. Mr. Johnson joined 3D Systems Corporation in July 2006 and held a number of senior management positions, including serving as Interim President and Chief Executive Officer from October 2015 to April 2016 and interim Chief Financial Officer from October 2023 to December 2023. Prior to joining 3D Systems Corporation, Mr. Johnson was an associate with Hunton & Williams LLP on the capital markets team. Mr. Johnson received an M.B.A. from the University of Michigan, a Juris Doctor from the University of Virginia and a Bachelor of Arts degree in political science, diplomacy & foreign affairs, and religion from Miami University. We believe Mr. Johnson is qualified to serve on our Board based on his years of executive leadership experience in public companies and his significant financial and legal operating roles in the Company.

**Defendant Cisneros**

14. Defendant Cisneros has served as a Company director since April 2021. She also serves as the Chair of the Compensation Committee and the Redemption Election Committee and as a member of the Nominating and Corporate Governance Committee.

15. The 2026 Proxy Statement stated the following about Defendant Cisneros:

> Ms. Cisneros, age 46, has served as a member of our Board since April 2021. Since September 2013, Ms. Cisneros has served as the Chief Executive Officer of Cisneros, a global enterprise focused on media & entertainment, digital advertising solutions, real estate, and social leadership, and she served as its Vice Chairman and Director of Strategy from September 2005 to August 2013. Ms. Cisneros currently serves on the boards of directors of Mattel Inc. and Ford Motor Company, and also serves on numerous non-profit boards. Ms. Cisneros holds a B.A. in journalism from Columbia University, a M.A. in journalism from New York University and a degree in leadership development from the Harvard Business School. We believe Ms. Cisneros is qualified to serve on our Board, serve as chair of our Compensation Committee and our Redemption Election Committee, and be a member of our Nominating and Corporate Governance Committee based on her significant executive leadership experience in media, real estate, entertainment and digital and consumer products.

**<u>Defendant Ibbetson</u>**

16. Defendant Ibbetson has served as a Company director since April 2021. He also serves as a member of the Network Planning and Spectrum Committee.

17. The 2026 Proxy Statement provided the following about Defendant Ibbetson:

> Mr. Ibbetson, age 57, has served as a member of our Board since April 2021. Mr. Ibbetson has worked with Vodafone since 1996 and has led the Vodafone Group Research and Development Organization since 2013, which is responsible for all aspects of future research, including trials of emerging technologies. Mr. Ibbetson serves on the board of several industry groups and initiatives, including the 5G Automotive Alliance, and serves as Chairman of the Next Generation Mobile Networks Alliance Board Strategy committee. Mr. Ibbetson holds a B.Sc. in electronic engineering and a M.Sc. in telecommunications from the University of Leeds. We believe Mr. Ibbetson is qualified to serve on our Board based on his years of experience and commitment to innovative thinking in the telecommunications industry.

**<u>Defendant Knapp</u>**

18. Defendant Knapp has served as a Company director since April 2021. He also serves as a member of the Network Planning and Spectrum Committee.

19. The 2026 Proxy Statement stated the following about Defendant Knapp:

> Mr. Knapp, age 65, has served as a member of our Board since April 2021. Mr. Knapp previously served as the corporate Chief Technology Officer for American Tower Corporation. Prior to joining American Tower in 2017, Mr. Knapp served as Senior Vice President of Engineering at Qualcomm, where he was responsible for Qualcomm's New Jersey Corporate Research Center, from which he managed a global engineering team of wireless researchers and semiconductor product engineering staff. He currently serves on the board of directors of the Center for Automotive Research and EdgeQ Inc. Mr. Knapp is also a member of the Technical Advisory board of Ciena Inc. and a member of the CEAS Dean's Advisory Council at Stony Brook University. He holds 5 US Patents. Mr. Knapp completed a B.E. in electrical engineering from Stony Brook University, an M.S. in electrical engineering from Polytechnic University (NYU) in New York, and an M.B.A. from Columbia University. We believe Mr. Knapp is qualified to serve on our Board based on his more than 40 years of communications technology experience and 35 years of experience in the development of the global wireless industry.

**Defendant Larson**

20. Defendant Larson has served as a Company director since January 2025. He also serves as a member of the Network Planning and Spectrum Committee.

21. The 2026 Proxy Statement provided the following about Defendant Larson:

> Mr. Larson, age 68, has served as a member of our Board since January 2025. Mr. Larson is currently retired after previously serving as a Vice President of Intel Corporation and Senior Managing Director of Intel Capital, Intel's strategic investment and M&A group, until his retirement in April 2019. He joined Intel in 1996, was appointed Vice President in 2006, and served as a Managing Director of Intel Capital from 2004 to 2018. Mr. Larson is currently a consultant for AT&T, a director of NWPX Infrastructure, Inc., a manufacturing company, and a Venture Partner of QBIT, an early-stage venture capital fund focused on emerging opportunities in Switzerland. Mr. Larson previously served on the board of directors of Rogers Corporation, a publicly-held specialty engineered materials company, from December 2020 to May 2023. Mr. Larson holds a B.S. in Business Administration from University of Southern California and is a graduate of the Executive Education Program at Stanford University and is a Certified Public Accountant (inactive). Mr. Larson holds a certificate in cybersecurity oversight and has expertise in evaluating deep technology businesses. We believe Mr. Larson is qualified to serve on our Board based on his deep expertise in corporate development and corporate governance.

**Defendant Mikitani**

22. Defendant Mikitani served as a Company director from April 2021 to January 13, 2026.

23. During the Relevant Period when prices of the Company's stock were artificially inflated before the scheme was exposed, Defendant Mikitani made the following sales of the Company's Class A common stock:[3]

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 14, 2026 | 1,690,000 | $91.42 | $154,499,800 |
| April 15, 2026 | 1,350,000 | $86.22 | $116,397,000 |

Thus, in total, before the fraud was exposed, Defendant Mikitani sold 3,040,000 shares of Company Class A common stock on inside information, for which he received approximately $270.9 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the schemes.

24. The proxy statement on Schedule 14A filed with the SEC on April 25, 2025 (the "April 2025 Proxy Statement") provided the following about Defendant Mikitani:

> Mr. Mikitani, age 60, has served as a member of our Board since April 2021. Mr. Mikitani is the founder, Chairman and Chief Executive Officer of Rakuten Group, Inc. Founded in 1997 with the mission to contribute to society by creating value through innovation and entrepreneurship, Rakuten Group, Inc. is one of the world's leading internet service companies. Mr. Mikitani also serves as Vice Chairman and co-Chief Executive Officer of Rakuten Medical, Inc., a global biotechnology company developing precision, cell-targeting investigational therapies on its Alluminox™ platform. Mr. Mikitani has previously served as a member of the Lyft,

[3] These shares were sold by Rakuten Mobile, Inc., a wholly-owned subsidiary of Rakuten Group, Inc. Defendant Mikitani is the founder, Chairman and CEO of Rakuten Group, Inc. and has voting and investment discretion with respect to the securities held of record by Rakuten Mobile, Inc.

> Inc. board of directors and currently serves on the boards of directors of a number of privately held companies. In 2011, he was appointed Chairman of the Tokyo Philharmonic Orchestra. He also serves as Representative Director of the Japan Association of New Economy (JANE). Mr. Mikitani holds a commerce degree from Hitotsubashi University and an M.B.A. from Harvard Business School. We believe Mr. Mikitani is qualified to serve on our Board based on his extensive operating and management experience with major technology and telecommunications companies.

**Defendant Rubin**

25. Defendant Rubin has served as a Company director since April 2021. He also serves as a member of the Audit Committee.

26. The 2026 Proxy Statement provided the following about Defendant Rubin:

> Mr. Rubin, age 59, has served as a member of our Board since April 2021. Mr. Rubin is the Co-Founder and Managing Director of Tower Alliance, LLC. Founded in 2014, Tower Alliance, LLC is a leading provider of outsourced services to wireless infrastructure owners. Mr. Rubin served as Chief Financial Officer of Global Tower Partners from 2010 to 2013. Mr. Rubin holds a B.S. in Accounting from American University and a M.S. in Taxation from Florida International University and is a Certified Public Accountant. We believe Mr. Rubin is qualified to serve on our Board and be a member of our Audit Committee based on his years of experience in the telecommunications industry.

**Defendant Sarnoff**

27. Defendant Sarnoff has served as a Company director since April 2021. He also serves as Chair of the Nominating and Corporate Governance Committee.

28. The 2026 Proxy Statement stated the following about Defendant Sarnoff:

> Mr. Sarnoff, age 66, has served as a member of our Board since April 2021. Mr. Sarnoff is Chairman of Media, KKR Americas Private Equity, and also Chairman of Simon & Schuster, Inc. He previously led the Media and Communications industry group at Kohlberg Kravis Roberts & Company, which invested in the media, telecom, digital media and education sectors in the United States. Mr. Sarnoff currently serves on the board of directors of Chegg, Inc. and of several private companies, as well as several not-for-profit organizations. Mr. Sarnoff holds a B.A. in Art and Archeology from Princeton University and an M.B.A. from Harvard Business School. We believe Mr. Sarnoff is qualified to serve on our Board

> and serve as Chairman of our Nominating and Corporate Governance Committee based on his extensive experience serving in senior finance and investment leadership roles, and on the boards of directors of media and digital technology companies.

**Defendant Torres**

29. Defendant Torres has served as a Company director since April 2021. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

30. During the Relevant Period when prices of the Company's stock were artificially inflated before the scheme was exposed, Defendant Torres made the following sales of the Company's Class A common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| May 13, 2026 | 15,000 | $76.34 | $1,145,100 |

Thus, in total, before the fraud was exposed, Defendant Torres sold 15,000 shares of Company Class A common stock on inside information, for which he received approximately $1.1 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the schemes.

31. The 2026 Proxy Statement provided the following about Defendant Torres:

> Mr. Torres, age 58, has served as a member of our Board since April 2021. Mr. Torres has served as the managing partner at Multiple Equilibria Capital, a financial advisory firm, since March 2013. Mr. Torres previously served as the Chief Executive Officer and member of the board of directors of Andina Acquisition Corp. III, a blank check company, from January 2019 until its merger with Stryve Foods, Inc. in July 2021. From August 2015 to March 2018, Mr. Torres served as Chief Executive Officer and a member of the board of directors of Andina

> Acquisition Corp. II, a blank check company that consummated an initial business combination with Lazy Days' R.V. Center, Inc. From October 2011 through January 2013, Mr. Torres served as Co-Chief Executive Officer of Andina Acquisition Corp. He also served as a member of the board of Andina Acquisition Corp. from October 2011 until its merger in December 2013 with Tecnoglass Inc. and has continued to serve on the board of Tecnoglass Inc. since such time. Mr. Torres also serves on the board of several international public companies. Mr. Torres graduated from the Universidad de los Andes and received an M.B.A. from the Kellogg Graduate School of Management at Northwestern University and a Master's in Public Administration from the J.F. Kennedy School of Government at Harvard University. We believe Mr. Torres is qualified to serve on our Board, serve as the Chairman of our Audit Committee, and be a member of our Compensation Committee and our Nominating and Corporate Governance Committee based on his extensive operational and corporate governance experience.

**Defendant Wibergh**

32. Defendant Wibergh has served as a Company director since June 2024. He also serves as the Chair of the Network Planning and Spectrum Committee and as member of the Audit Committee and the Compensation Committee.

33. The 2026 Proxy Statement provided the following about Defendant Wibergh:

> Mr. Wibergh, age 61, has served as a member of our Board since June 2024. Mr. Wibergh is currently retired, and previously served as Chief Technology and Information Officer of Vodafone, a global telecommunications provider, from May 2015 to December 2022. From July 2008 to January 2015, he served as Executive Vice President & Head of Business Unit Networks for Ericsson, a multinational networking and telecommunications company. He has over 35 years of experience in managing large-scale operations across the globe, having served in various C-suite positions with leading global companies for more than 15 years. He brings with him a wealth of experience in technology innovation and leadership in networking and telecommunications. His leadership experience spans various areas such as telecoms networks, enterprise networks, digital and IT systems, cyber security, R&D, product management, operational excellence, and large-scale 24/7 operations. Mr. Wibergh currently serves on the board of directors of Trimble Inc., a public technology company, and Bell Canada, a public telecommunications company in Canada. Mr. Wibergh is also a member of the Executive Advisory board of Arrcus Inc. Mr. Wibergh also currently serves on the boards of directors of various private companies. Mr. Wibergh's previous board experience includes Vantage Towers AG (2020-2022), KTH Royal Institute of Technology (2010-2016) and chairman of Next Generation Mobile Networks (2016-2018). He has also

> served on the advisory boards of IBM, HP Enterprises and Amdocs. Mr. Wibergh has a Master's in Computer Science and Engineering from Linkoping University, Sweden. We believe Mr. Wibergh is qualified to serve on our Board and be a member of our Compensation Committee and our Audit Committee based on his extensive experience and commitment to innovative thinking in the telecommunications industry. His professional experience also uniquely qualifies him to lead our Network Planning and Spectrum Committee.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

34. By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of AST SpaceMobile and because of their ability to control the business and corporate affairs of AST SpaceMobile, the Individual Defendants owed AST SpaceMobile and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage AST SpaceMobile in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of AST SpaceMobile and its shareholders so as to benefit all shareholders equally.

35. Each controlling shareholder, director, and officer of the Company owes to AST SpaceMobile and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

36. The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors and/or officers of AST SpaceMobile, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37. To discharge their duties, the controlling shareholders, officers and directors of AST SpaceMobile were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

38. Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders, directors, and officers of AST SpaceMobile, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of AST SpaceMobile Board at all relevant times.

39. As controlling shareholders, senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock

would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

40. To discharge their duties, the controlling shareholders, officers, and directors of AST SpaceMobile were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholders, directors, and/or officers of AST SpaceMobile were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to AST SpaceMobile's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how AST SpaceMobile conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of AST SpaceMobile and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that AST SpaceMobile's operations would comply with all applicable laws and AST SpaceMobile's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

41. Each of the Individual Defendants further owed to AST SpaceMobile's and the shareholders the duty of loyalty requiring that each favor AST SpaceMobile's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

42. At all times relevant hereto, the Individual Defendants were the agents of each other and of AST SpaceMobile and were at all times acting within the course and scope of such agency.

43. Because of their advisory, executive, managerial, directorial, and controlling positions with AST SpaceMobile, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

44. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AST SpaceMobile.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

45. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

46. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

47. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of AST

SpaceMobile was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

48. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

49. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of AST SpaceMobile and was at all times acting within the course and scope of such agency.

## AST SPACEMOBILE'S CODE OF CONDUCT

50. AST SpaceMobile's Code of Conduct represents that it "applies to the Company's directors, officers and other employees. It is the individual responsibility of each Company employee and director to comply with this Code."

51. Under the heading "Introduction," within the subheading, "Reporting Violations of the Code," the Code of Conduct provides the following, in relevant part:

> Employees and directors have a duty to report any known or suspected violation of this Code, including violations of the laws, rules, regulations or policies that apply to the Company. If you know of or suspect a violation of this Code, you should immediately report the conduct to your supervisor or the Company's General Counsel. The Company's General Counsel will work with you and your supervisor or other appropriate persons to investigate your concern. If you do not feel comfortable reporting the conduct to your supervisor or you do not get a satisfactory response, you may contact the Company's General Counsel directly. You may also report known or suspected violations of the Code by telephone at 1-833-547-0151 or on the Internet at ast-science.ethicspoint.com, both of which are available 24

> hours a day, 7 days a week. You may remain anonymous and will not be required to reveal your identity in a telephone call the hotline, although providing your identity may assist the Company in investigating your concern. All reports of known or suspected violations of the law or this Code will be handled sensitively and with discretion. Your supervisor, the Company's General Counsel and the Company will protect your confidentiality to the extent possible, consistent with applicable laws and the Company's need to investigate your concern.
>
> It is Company policy that any employee or director who violates this Code will be subject to appropriate discipline, which may include, for an employee, termination of employment or, for a director, a request that such director resign from the Board of Directors of the Company (the "Board"). This determination will be based upon the facts and circumstances of each particular situation. If you are accused of violating this Code, you will be given an opportunity to present your version of the events at issue prior to any determination of appropriate discipline. Employees and directors who violate the law or this Code may expose themselves to, amongst other consequences, substantial civil damages, criminal fines and prison terms. The Company may also face substantial fines and penalties and may incur damage to its reputation and standing in the community.

52. Under the same heading, within the subheading "Waivers of the Code," the Code of Conduct provides the following:

> Any waiver of this Code for our directors, executive officers or other principal financial officers may be made only by our Board and will be disclosed to the public as required by law or the rules of The Nasdaq Stock Market LLC, when applicable. Waivers of this Code for other employees may be made only by our General Counsel and will be reported to our Audit Committee.

53. Under the heading "Conflicts of Interest," the Code of Conduct provides the following:

> Employees, officers and directors must act in the best interests of the Company. You must refrain from engaging in any activity or having a personal interest that presents a "conflict of interest" and should seek to avoid even the appearance of a conflict of interest. A conflict of interest occurs when your personal interest interferes with the interests of the Company. A conflict of interest can arise whenever you, as an employee, officer or director, take action or have an interest that prevents you from performing your Company duties and responsibilities honestly, objectively and effectively. For further information regarding conflicts of interest, including your disclosure obligations with respect to any potential conflict of interest, please refer to the AST SpaceMobile, Inc. Conflict of Interest Policy.

54. Under the heading, "Company Records," the Code of Conduct provides the following:

> Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, records relating to our technology and product development, customer collaborations, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business.
>
> All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow the Company's Recordkeeping Policy.

55. Under the heading "Accuracy of Financial Reports and Other Public Communications," the Code of Conduct provides the following:

> As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and the Company's policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.
>
> The Company's principal financial officers and other employees working in the finance department have a special responsibility to reasonably ensure that the Company's financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all applicable standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

56. Under the heading "Compliance with Laws and Regulations," the Code of Conduct provides the following:

> Each employee and director has an obligation to comply with all applicable laws, rules and regulations applicable to the Company's operations. These include without limitation, laws covering bribery and kickbacks, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment

> discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor, the General Counsel or the Head of Compliance.

57. Under the same heading, under the subheading "Compliance with Insider Trading Laws," the Code of Conduct provides the following:

> Consistent with the Company's Insider Trading Compliance Policy, the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company. In addition, Company employees and directors are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell the Company's stock or other securities on the basis of material non-public information. Employees and directors who obtain material non-public information about another company in the course of their duties are prohibited from trading in the stock or securities of the other company while in possession of such information or "tipping" others to trade on the basis of such information. Violation of insider trading laws can result in severe fines and criminal penalties, as well as disciplinary action by the Company, up to and including, for an employee, termination of employment or, for a director, a request that such director resign from the Board. You are required to read carefully and observe our Insider Trading Compliance Policy, as amended from time to time. Please contact the Company's General Counsel for a copy of the Insider Trading Compliance Policy or with any questions you may have about insider trading laws.

58. Under the same heading, under the subheading "Public Communications and Regulation FD," the Code of Conduct provides the following, in relevant part:

> The Company's policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. The Company has adopted a separate Policy Statement – Guidelines for Corporate Disclosure to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.
>
> In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose

> material non-public information about the Company to securities market professionals or the Company's stockholders, we must also disclose the information to the public. The Company has designated certain individuals as "spokespersons" who are responsible for communicating with analysts, institutional investors and representatives of the media on these topics. Any employee or director who is not a designated spokesperson of the Company is prohibited from communicating any information about the Company on these topics to analysts, institutional investors, other stockholders or representatives of the media, except at the request of the Company's designated spokespersons.

59. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and violations of the Exchange Act. Additionally, in violation of Code of Conduct, the Individual Defendants failed to maintain the accuracy of AST SpaceMobile's records and reports, failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## AUDIT COMMITTEE CHARTER

60. The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter describes the purpose of the Audit Committee as "to oversee the accounting and financial reporting processes of AST SpaceMobile, Inc. (the '**Company**') and the audits of the financial statements of the Company." (Emphasis in original).

61. In the section titled "Duties and Responsibilities," the Audit Committee Charter states the following duties and responsibilities of the Audit Committee, in relevant part:

<u>*Annual Financial Statements and Annual Audit*</u>

3. *Form 10-K Review.* The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The Committee shall then recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

4. *Audit Committee Report.* The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

<u>*Quarterly Financial Statements*</u>

5. *Form 10-Q Review.* The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

<u>*Other Duties and Responsibilities*</u>

6. *Review of Earnings Releases.* Discuss generally the Company's earnings press releases, including the type and presentation of information to be included, as well as the financial information and any earnings guidance provided to analysts in quarterly conference calls and to rating agencies.

7. *Risk Assessment and Risk Management.* The Committee must discuss the Company's policies with respect to risk assessment and risk management.

* * *

10. *Review of Related Person Transactions.* The Committee must review all related person transactions as defined by Item 404 of Regulation S-K on an ongoing basis and all such transactions must be approved by the Committee.

11. *Internal Control Over Financial Reporting and Disclosure Controls and Procedures*. The Audit Committee shall coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct.

12. *Review Accounting Principles.* To review with management and the Company's independent auditors: any major issues regarding accounting principles and financial statement presentation, including any significant changes in the

> Company's selection or application of accounting principles; any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including the effects of alternative GAAP methods; and the effect of regulatory and accounting initiatives and off-balance sheet structures on the Company's financial statements.
>
> 13. *Review of Code of Ethics*. The Committee must, at least annually, consider and discuss with management and the independent auditor the Company's Code of Ethics and the procedures in place to enforce the Code of Ethics. The Committee must also consider and discuss and, as appropriate, grant requested waivers from the Code of Ethics brought to the attention of the Committee, though the Committee may defer any decision with respect to any waiver to the Board.

(Emphasis in original).

62. In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## **THE INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

63. AST SpaceMobile is a pioneering space-based technology company developing its SpaceMobile Service – the first global cellular broadband network in space directly accessible to smartphones, for both commercial and governmental applications. The Company plans to provide

the SpaceMobile Service through a constellation of high-powered BB satellites in low orbital Earth.

64. Leading up to the Relevant Period, the Company launched five first generation commercial BB satellites ("Block 1 BB satellites"). All five Block 1 BB satellites have participated in numerous tests conducted by the Company, which have shown positive results. For example, in February 2025, the Company successfully completed its voice and video tests on smartphones.

65. Other market competitors similarly announced significant developments. In September 2025, the EchoStar SpaceX agreement was announced posing a significant competition risk for the Company, as SpaceX and Starlink together have a high launch capacity and existing satellite constellation infrastructure.

66. Against this market backdrop, the Company has continued to work on advancements to its satellite technology. Notably, during the Relevant Period, on December 23, 2025, the Company launched its first second generation commercial BB satellites ("Block 2 BB satellites"), which the Company purports will deliver up to 10 times the bandwidth of the current Block 1 BB satellites. The Block 2 BB satellites feature the largest phased array ever deployed in low orbital Earth for commercial use. The larger aperture array is expected to provide improved signal strength and capacity resulting in a smaller number of satellites necessary to achieve service coverage.

67. To launch and operate the SpaceMobile Service as intended, the Company is working to increase the number of its BB satellites that are deployed in low orbital Earth. With the launch of the Company's first Block 2 BB satellite on December 23, 2025, the Company announced a campaign to launch 45 to 60 Block 2 BB satellites by the end of 2026.

**Materially False and Misleading Statements**

***March 3, 2025 Press Release***

68. The Relevant Period began on March 3, 2025, after markets closed, when the Company published a press release announcing its fourth quarter and full year results for the 2024 fiscal year (the "FY 2024 Press Release"). The FY 2024 Press Release quoted Defendant Avellan as stating the following, in pertinent part:

> [W]e enter 2025 ***even better positioned to lead the emerging direct-to-device satellite communications industry that we invented*** . . . . The many pieces of our plan are ***rapidly coming into place***. ***We advanced our customer ecosystem, formalized definitive commercial agreements, and expanded our U.S. Government capabilities.*** Finally, we completed a carefully structured financing transaction with minimal dilution to current shareholders, ***enabling us to accelerate our manufacturing efforts and start 2025 stronger than ever***.[]
>
> []***With nearly $1.0 billion in cash on our balance sheet*** pro forma for the recent offering of convertible notes, ***an alliance of industry leading partners, and our proprietary technology, we are well-positioned for continued success*** . . . . We are laser-focused on building and deploying satellites and expanding our commercial agreements during 2025, moving toward commercial-scale revenues. Our vision has never been clearer, and we believe ***we have the resources and capabilities to execute our plans***.

69. The FY 2024 Press Release highlighted the Company's growth and improvement in its commercial and financial positioning, stating, in pertinent part:

> **Significant advancement in commercialization of SpaceMobile network with new commercial agreements with Vodafone and the U.S. Government**
>
> * * *
>
> **Achieved full operational status for first five BlueBird commercial satellites, each the largest-ever commercial communications arrays deployed in low Earth orbit (LEO)**
>
> * * *
>
> **Accelerated satellite manufacturing with planning and production of 40 Block 2 BlueBird satellites underway at AST SpaceMobile manufacturing facilities**

> **in Midland, Texas**
>
> * * *
>
> **Spectrum agreement for long-term access to up to 45 MHz of premium lower mid-band spectrum in the U.S. for direct-to-device applications will enable peak data transmission speeds of up to 120 Mbps nationwide**
>
> * * *
>
> **Robust balance sheet with nearly $1.0 billion in cash, cash equivalents, and restricted cash (as of December 31, 2024), pro forma for convertible notes offering**

(Emphasis in original).

***March 3, 2025 Form 10-K***

70. The same day, the Company filed with the SEC an annual report on Form 10-K for its 2024 fiscal year (the "2024 Form 10-K"). The 2024 Form 10-K was signed by Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Rubin, Sarnoff, Torres, and Wibergh.

71. The 2024 Form 10-K also attached certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Avellan and Johnson certifying the accuracy of the 2024 Form 10-K and further attesting to the following, in relevant part:

> [T]his report [2024 Form 10-K] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> * * *
>
> …the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]

72. The 2024 Form 10-K emphasized the Company's purported competitive advantages, in relevant part:

> ***Large Addressable Market***
>
> ***
>
> ***Delivery of Cellular Broadband Coverage at a Competitive Cost***
>
> ***
>
> ***Definitive Commercial Agreements with MNOs [Mobile Network Operators] Enabling Access to Key Markets and Potentially Large Number of Subscribers***
>
> ***
>
> ***Cellular Broadband Directly to Unmodified Devices***
>
> ***
>
> ***Satellites Designed for Great Functionality, Power and Redundancy***
>
> ***
>
> ***Cost Advantages due to Greater Control of our Manufacturing***
>
> ***
>
> ***Capability to Support Both Commercial and Government Applications on the Same Satellite or on a Singular Infrastructure***

(Emphasis in original).

73. The 2024 Form 10-K also discussed the Company's financial positioning, stating:

> We believe our cash and cash equivalents on hand and our ability to raise capital through access to the 2024 ATM Equity Program will be sufficient ***to meet our current working capital needs, planned operating expenses and capital expenditures for a period of the next 12 months from the date of this Annual Report***."

***April 25, 2025 Proxy Statement***

74. On April 25, 2025, Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres, and Wibergh solicited the April 2025 Proxy Statement,

which contained material misstatements and omissions.

75. The April 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres and Wibergh to the Board; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the year ended on December 31, 2025; (3) to approve an amendment to the Company's Second Amended and Restated Certificate of Incorporation permitting Company stockholders to take action, by written consent, for the purpose of removing directors; (4) approve, on an advisory basis, the compensation paid to the Company's named executive officers; and (5) approve, on an advisory basis, the frequency of future advisory votes regarding the compensation of the Company's named executives.

76. Regarding the Company's Code of Conduct and "Corporate Governance Framework", the April 2025 Proxy Statement stated the following:

> The Board has adopted a Code of Business Conduct and Ethics (the "Code of Ethics") that, along with the Company's Second Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation"), our Amended and Restated Bylaws ("Bylaws"), the charters of the committees of the Board (the "Committees") and our Amended and Restated Stockholders' Agreement (the "Stockholders' Agreement"), provide the framework for the governance of the Company. Our Code of Ethics applies to all of our directors, executive officers and employees, including our principal executive officer, principal financial officer, principal accounting officer and persons performing similar functions. The Code of Ethics is available on our corporate website at https://investors.ast-science.com. We intend to make any legally required disclosures regarding amendments to, or waivers of, provisions of our Code of Ethics on our website rather than by filing a Current Report on Form 8-K. The charters for all of our Committees as well as our Corporate Governance Guidelines are also available under the "Governance" link under the heading "Investors" on our website at https://investors.ast-science.com.

77. Regarding the Company's "Risk Oversight," the April 2025 Proxy Statement stated the following, in relevant part:

> Our Board is responsible for overseeing our risk management process. Our Board focuses on our general risk management strategy, the most significant risks facing us, and oversees the implementation of risk mitigation strategies by management. While our Board is ultimately responsible for overseeing our risk management process, certain committees assist our Board in overseeing parts of our overall risk management and regularly reports to the Board regarding risk and the related risk management. During fiscal 2024, the Board's Committees assisted with the following responsibilities:
>
> - **Audit Committee**: Reviewing our accounting, reporting and financial practices, including the integrity of our financial statements and the oversight of our financial controls; and overseeing the Company's policies with respect to risk assessment and risk management, including overseeing management's implementation and execution of our cybersecurity risk management strategy and processes.
>
> * * *
>
> In addition, our Board receives periodic detailed operating performance reviews from management regarding certain risks and related management processes and procedures. The Board believes its current leadership structure enables it to fulfill its risk oversight function.

(Emphasis in original).

78. Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres and Wibergh caused the April 2025 Proxy Statement to be false and misleading by failing to disclosed, *inter alia*, that: (1) the Company was facing slow user adoption in Japan and the U.S.; (2) the Company's competitive advantage and positioning in the satellite direct-to-cellular market was overstated; (3) the Company lacked the sufficient capital and liquidity to meet strategic product development and business goals; and (4) consequently, the frequency at which the Company would likely require increasing its debt load and share dilution was significantly understated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

79. The April 2025 Proxy Statement was also false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the April 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

80. As a result of Individual Defendants causing the April 2025 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) re-elect Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres, and Wibergh to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) appoint KPMG LLP as the Company's independent registered public accounting firm for the year ended December 31, 2025; (3) approve an amendment to the Company's Second Amended and Restated Certificate of Incorporation permitting Company stockholders to take action, by written consent, for the purpose of removing directors; (4) approve, on an advisory basis, the compensation of AST SpaceMobile's named executives; and (5) approve, on an advisory basis, future advisory votes at a frequency of one year, on the compensation of AST SpaceMobile's named executives.

***May 12, 2025 Press Release and Form 10-Q***

81. On May 12, 2025, the Company published a press release announcing its financial results for the first quarter of 2025 (the "Q1 2025 Press Release"). Defendant Avellan was quoted in the Q1 2025 Press Release as touting the Company's growth towards meeting its strategic milestones as well as its financial prospects. In particular, Defendant Avellan stated,

"[c]ommercially, we have also expanded our U.S. Government opportunity and ***are in a position to start generating meaningful revenue during 2025***."

82. The Q1 2025 Press Release further highlighted the Company's purported commercial and financial success, stating in relevant part:

> **Announced multi-provider satellite orbital launch plan with five contracted launches over the next six to nine months**
>
> * * *
>
> **Advanced SpaceMobile network commercialization efforts, with expected second half 2025 revenue opportunity of $50.0 million to $75.0 million**
>
> * * *
>
> **Continued to make strong progress on regulatory approvals and spectrum-related topics with partners and key industry groups**
>
> * * *
>
> **Robust balance sheet with $874.5 million in cash, cash equivalents, and restricted cash as of March 31, 2025, with continued access to diverse capital markets**[.]

(Emphasis in original).

83. The same day, the Company filed with the SEC a quarterly report on Form 10-Q for the first quarter of 2025 (the "Q1 2025 Form 10-Q"), which was signed by Defendants Avellan and Johnson. The Q1 2025 Form 10-Q also attached SOX certifications signed by Defendants Avellan and Johnson, and which were substantially similar to the SOX certifications attached to the attesting to the 2024 Form 10-K.

84. The Q1 2025 Form 10-Q continued to assure investors of the stability of the Company's financial positions, providing in relevant part:

> We believe ***our existing cash and cash equivalents on hand will be sufficient to meet our anticipated cash requirements, including current working capital needs, planned operating expenses and capital expenditures for a period of the next 12 months from the date of this Quarterly Report.***

***August 11, 2025 Press Release***

85. On August 11, 2025, the Company published a press release announcing its financial performance for the second quarter of 2025 (the "Q2 2025 Press Release"). In the Q2 2025 Press Release, Defendant Avellan was quoted as stating, in pertinent part, "we now have a path for premium spectrum on a global basis, ***which is uniquely valuable with our innovative technology*** backed by over 3,700 patent and patent pending claims to support up to 120 Mbps peak data rates per cell globally."

86. The Q2 2025 Press Release additionally highlighted the Company's financial success, emphasizing developments including:

> **Preparing to deploy nationwide intermittent service in the United States by the end of 2025, followed by the United Kingdom, Japan, and Canada in Q1 2026**
>
> ***
>
> **Expanded spectrum strategy with agreement to acquire 60 MHz of global S-Band spectrum priority rights, augmenting existing 3GPP cellular spectrum strategy and strengthening position within wireless ecosystem**
>
> ***
>
> **Advanced commercialization efforts with expansion of partnerships, derived from agreements with more than 50 mobile network operators globally, which have nearly 3.0 billion existing subscribers, while receiving additional U.S. Government contract awards**
>
> ***
>
> **Over $1.5 billion in balance sheet cash, cash equivalents, and restricted cash**

> **(as of June 30, 2025), pro forma for convertible notes offering and sales under the now terminated ATM facility**

(Emphasis in original).

***August 11, 2025 Earnings Call***

87. The same day, the Company held an earnings call for the second quarter of 2025 (the "Q2 2025 Earnings Call"). During the Q2 2025 Earnings Call, an analyst asked about the sufficiency of the Company's current funding, specifically, "given the current launch cadence and near-term goals, is your funding runway sufficient to reach initial commercial revenue or do you foresee additional capital need?" In response, Defendant Johnson stated, in pertinent part:

> Given our pro forma balance sheet at the end of Q2 of over $1.5 billion, we do believe that ***we are fully funded now*** to reach the 45 to 60 satellite level and as part of that, ***our capital strategy going forward will be one focused not on threshold business delivery needs***[.]

***August 11, 2025 Form 10-Q***

88. Also on August 11, 2025, the Company filed with the SEC a quarterly report on Form 10-Q for the second quarter of 2025 (the "Q2 2025 Form 10-Q"), which was signed by Defendants Avellan and Johnson. The Q2 2025 Form 10-Q also attached SOX certifications signed by Defendants Avellan and Johnson which were substantially similar to the SOX certifications attached to the 2024 Form 10-K.

89. The Q2 2025 Form 10-Q reiterated the stability of the Company's financial positioning, providing in relevant part:

> We believe our existing cash and cash equivalents on hand ***will be sufficient to meet our anticipated cash requirements, including current working capital needs, planned operating expenses and capital expenditures for a period of the next 12 months from the date of this Quarterly Report.***

90. The statements above, referenced in ¶¶ 68-73, 81-89 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was facing slow user adoption in Japan and the U.S.; (2) the Company's competitive advantage and positioning in the satellite direct-to-cellular market was overstated; (3) the Company lacked the sufficient capital and liquidity to meet strategic product development and business goals; and (4) consequently, the frequency at which the Company would likely require increasing its debt load and share dilution was significantly understated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

***September 8, 2025 Financial Report***

91. The truth began to emerge on September 8, 2025, when the UBS Report downgraded the Company to a "Neutral" recommendation from the previous "Buy" recommendation. In addition, the UBS Report further dropped its pricing target for the Company from $62.00 to $43.00. In making these changes, the UBS Report cited the increased market competition, namely Starlink and the EchoStar Transaction. Specifically, the UBS Report stated, in relevant part:

> **Starlink (AST's primary competitor) enhances positioning with spectrum deal**
> We are downgrading ASTS to Neutral from Buy and lowering our PT to $43 ($62 prior) . . . . [W]e believe Starlink's newly announced acquisition of Echostar's SBand spectrum for $19B fortifies its position in the space to cellular market and increases risk for ASTS as it drives utilization on its nascent constellation. We . . . now see a more balanced risk-reward with competitive concerns likely to persist.

> We are lowering our LT [long-term] utilization assumptions and now look for $383M of revenue/$82M of EBITDA in 2026 (unch.), scaling to $3.0B/2.4B in 2030 (vs. $3.6B/$2.9B prior and Factset consensus $3.7B/2.7B).
>
> **Still see room for multiple players in space to cellular but execution risk higher**
> While we still believe the market opportunity will support multiple players LT, we believe the newly announced spectrum deal between Echostar and Starlink enhances the positioning of ASTS' primary competitor and creates added execution risk. Starlink began targeting space to cellular service with new satellites in recent years, but we believe the spectrum transaction 1) signals Starlink's commitment to scaling in this market with a full broadband/voice solution leveraging multiple spectrum bands and 2) enhances its standing with more spectrum rights to pair with its launch capabilities. While certain direct to device carrier deals have exclusive elements initially, carriers could also increasingly explore working with multiple providers in time.
>
> **Lowering utilization assumptions and estimates**
> AST is targeting 5 launches by 1Q26 with 45-60 Block 2 satellites deployed by YE26, enabling continuous coverage in target markets. Our prior 2030 base case ($3.6B of rev) aligned with ~35% capacity utilization but we now look for $3.0B of rev/30% utilization given greater competition. This assumes a more gradual ramp in both carrier/gov't revenues (UBSe $2.3B/$700M in 2030 vs. $2.8B/$800M prior), flowing through at high margin given high fixed costs.
>
> **Valuation: Lowering price target; downgrade to Neutral**
> We are lowering our PT to $43, based on 10x 2030E EBITDA (in-line with multi-yr avg for public satellite comps) discounted back at 14%. Our prior PT was based on 12x 2030E EBITDA (discounted at 14%) or at the high-end of the peer avg historically but we believe a lower multiple is justified given increased competitive concerns.

(Emphasis in original).

92. On this news, the price of the Company's Class A common stock fell $3.86 or approximately 9.5%, from a closing price of $40.77 per share on September 8, 2025, to close at $36.91 per share on September 9, 2025.

***October 21, 2025 Offering Press Releases***

93. The truth continued to emerge on October 21, 2025, when the Company issued a press release announcing a proposed private offering with an aggregate principal of $850 million

(the "Initial 2025 Offering Press Release"). The Initial 2025 Offering Press Release detailed the following, in relevant part:

> [A]nnounced its intent to offer, subject to market conditions and other factors, $850.0 million aggregate principal amount of convertible senior notes due 2036 (the "Notes") in a private offering (the "Notes Offering") . . . AST SpaceMobile also intends to grant the initial purchasers of the Notes in the Notes Offering an option to purchase, for settlement within a 13-day period beginning on, and including, the date on which the Notes are first issued, up to an additional $150.0 million aggregate principal amount of Notes.

94. The Initial 2025 Offering Press Release also revealed that the proceeds from this offering would be used "for general corporate purposes, including without limitation ***funding the deployment of AST SpaceMobile's worldwide constellation of satellites in anticipation of adding incremental strategic markets for its SpaceMobile Service***."

95. Later the same day, the Company issued another press release "announc[ing] the pricing of $1.0 billion aggregate principal amount of convertible senior notes due 2036 (the "Notes") in a private offering[,]" and noted that "the size of the offering has been increased from the previously announced $850.0 million principal amount of Notes."

96. Moreover, the press release reiterated that the proceeds from the offering would be used for "general corporate purposes, including without limitation ***funding the deployment of AST SpaceMobile's worldwide constellation of satellites in anticipation of adding incremental strategic markets for AST SpaceMobile's SpaceMobile Service***."

97. On this news, the price of the Company's Class A common stock fell $7.26 or approximately 9.2%, from a closing price of $78.61 per share on October 21, 2025, to close at $71.35 per share on October 22, 2025. Despite this disclosure, the Individual Defendants continued to obfuscate the truth about the Company's market competitiveness and financial positioning.

***October 28, 2025 Proxy Statement***

98. On October 28, 2025, the Company filed a proxy statement on Schedule 14A with the SEC (the "October 2025 Proxy Statement"). Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres and Wibergh solicited the October 2025 Proxy Statement, which contained material misstatements and omissions.

99. The October 2025 Proxy Statement called for the Company's shareholders to vote to approve the Amended and Restated AST SpaceMobile, Inc. 2024 Incentive Award Plan to increase the number of shares of AST SpaceMobile's Class A common stock for issuance thereunder and to extend term of the plan (the "Amended 2024 Plan").

100. The October 2025 Proxy Statement noted that if AST SpaceMobile shareholders voted to approve the Amended 2024 Plan, it would become effective immediately on the date of the Special Meeting, November 21, 2025, extending the expiration of the previous AST SpaceMobile, Inc. 2024 Incentive Award Plan (the "2024 Plan") to October 6, 2035. If not approved, the 2024 Plan would remain in effect and the Company may continue to grant award thereunder. Moreover, the October 2025 Proxy Statement stated that the "Board and the Compensation Committee believe that the Plan is a key part of the Company's philosophy and programs[,]" as it will further assist in attracting, retaining and motivating qualified talent. The October 2025 Proxy Statement further states that the approval of the Amended 2024 Plan will cause an additional 10,000,000 shares of Class A common stock for issuance under the Amended 2024 Plan. Per the October 2025 Proxy Statement, as of October 15, 2025, there were 527,006 shares of Class A common stock still available for issuance under the prior plan. Thus, if the Amended 2024 Plan was approved there would be a total of 10,527,006 shares of Class A common

stock available for issuance. The October 2025 Proxy Statement further notes that all consultants, employees, and non-employee directors are eligible to participate in the Amended 2024 Plan.

101. Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres and Wibergh caused the October 2025 Proxy Statement to be false and misleading by failing to disclosed, *inter alia*, that: (1) the Company was facing slow user adoption in Japan and the U.S.; (2) the Company's competitive advantage and positioning in the satellite direct-to-cellular market was overstated; (3) the Company lacked the sufficient capital and liquidity to meet strategic product development and business goals; and (4) consequently, the frequency at which the Company would likely require increasing its debt load and share dilution was significantly understated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

102. As a result of Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres and Wibergh causing the October 2025 Proxy Statement to be false and misleading, shareholders voted to approve the Amended 2024 Plan and to increase the number of Class A common stock available for issuance thereunder by 10,000,000 shares.

103. As a result of shareholders approving the Amended 2024 Plan, the plan took effect immediately upon reaching shareholder approval. Additionally, there were an additional 10,000,000 shares available for issuance under the Amended 2024 Plan. The Individual Defendants, most of whom are current directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading October 2025 Proxy Statement and the shareholders' approval of the 2024 Amended Plan. Moreover, certain of the Individual Defendants continue to receive material personal benefits

in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the 2024 Amended Plan in the future.

***November 10, 2025 Press Release and Form 10-Q***

104. On November 10, 2025, the Company issued the Q3 2025 Press Release. Despite the announcement of the proposed private offering only a few weeks earlier, the Q3 2025 Press Release touted the following developments, stating in relevant part:

> **Significant contract wins with the signing of definitive commercial agreements with stc Group and Verizon, as well as additional traction with U.S. Government customer**
>
> ***
>
> **Secured over $1.0 billion in aggregate contracted revenue commitments from partners as commercialization efforts and integration with partner networks accelerate**
>
> ***
>
> **Started multi-provider orbital launch campaign following shipment of BlueBird 6 to India with launch expected in first half of December**
>
> ***
>
> **Robust balance sheet with over $3.2 billion in cash, cash equivalents, restricted cash and liquidity. pro forma for convertible notes offering, monetized capped call, and aggregate proceeds and availability under the ATM facility (as of September 30, 2025)**

(Emphasis in original).

105. Moreover, Defendant Avellan is quoted in the Q3 2025 Press Release assuring investors that the Company "***continues to lead the direct-to-device space-based cellular broadband industry***[.]" He is further quoted as touting that "[***d]uring the past few months,***

***commercial activity has significantly accelerated, demonstrating the robust demand for our solution across the ecosystem***."

106. The same day, the Company also filed with the SEC a quarterly report on Form 10-Q for the third quarter of 2025 (the "Q3 2025 Form 10-Q"), which was signed by Defendants Avellan and Johnson. The Q3 2025 Form 10-Q also attached SOX certifications signed by Defendants Avella and Johnson which were substantially similar to the SOX certifications attached in the 2024 Form 10-K.

107. The Q3 2025 Form 10-Q provided assurances to the investing public about the Company's financial positioning and stability, specifically:

> We believe our existing cash and cash equivalents on hand ***will be sufficient to meet our anticipated cash requirements, including current working capital needs, planned operating expenses and capital expenditures for a period of the next 12 months from the date of this Quarterly Report***.

108. The statements above, referenced in ¶¶ 104-107, were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was facing slow user adoption in Japan and the U.S.; (2) the Company's competitive advantage and positioning in the satellite direct-to-cellular market was overstated; (3) the Company lacked the sufficient capital and liquidity to meet strategic product development and business goals; and (4) consequently, the frequency at which the Company would likely require increasing its debt load and share dilution was significantly understated.

***January 6, 2026 Financial Report***

109. The truth continued to emerge on January 6, 2026, with the release of the Scotiabank Report. The Scotiabank Report downgraded the Company's stock to a "Sell" recommendation. It further downgraded its "Sector Perform" rating to "Sector Underperform." The Scotiabank Report cited the Company's ongoing slower user adoption in Japan and the U.S. as well as substantial competition from Starlink, explaining, in relevant part:

> **OUR TAKE: Negative.** Without yet a single retail customer and faced by the challenge of orbiting ~50 satellites to hit continuous service in a handful of markets in late 2026 or early 2027, ASTS's share price at US$97.60/share has once again overshoot [*sic*] to what we see as irrational levels (market cap of US$37B). Evidence of slow user adoption in the U.S. and Japan, modest ARPUs and high capex (including duplicated satellites for new frequencies) means investors may have to wait until 2028 or 2029 for tangible EFCF generation. Meanwhile, Starlink's accelerated fixed growth and global brand recognition means ASTS competes with a leader that already has, in terms of revenues, the equivalent of 340 million global DTC users (~680 million by the time ASTS launches in select markets). While it has been an ordeal for ASTS to launch seven satellites since 2017, in 2025 alone Starlink orbited 3,169 units . . . . [W]e . . . disagree with those dismissing ASTS's multi-year delays and Starlink's unstoppable growth. The middle-ground scenario points to a valuation range between US$45/share and US$55/share. **Sell.**
>
> ***
>
> **We Believe ASTS Is Fairly Valued at Levels Closer to US$45-US$55 Per Share**
>
> The ASTS commercial launch in the U.S. may have to wait until early 2027, while carriers overseas may have to wait until 2028 or 2029. Our US$45.60/share target is based on EFCF of US$3.5B for 2028, supported by 225M paid subs under a global average ARPU of US$2.92/sub, not a conservative projection.
>
> Of note, in its 2025 report, Starlink reported 6M monthly users to its DTC [*i.e.*, D2C] services despite the company covering over 400M people (soon to expand to 1B with new markets such as Kazakhstan, Mexico, Mongolia, Peru, Switzerland, UK, Ukraine and Zambia). The service is already available in Australia, Canada, Chile, Japan, New Zealand and the United States. Projecting ASTS to have 225M paid subs by 2028 seems on the bullish side, especially if major carriers such as América Móvil decide to partner with Starlink (which is why we are following the Telcel move so closely).

> While TMUS [T-Mobile] did not provide specific numbers on DTC subscribers at the Q3/25 earnings release, early figures by KDDI in Japan suggest only 6% of the wireless base subscribed to the new service (it was launched earlier last year). Japan, however, is a highly penetrated market with impressive tower density (KDDI operates more towers than Vivo or TIMB in Brazil, a country with 21x Japan's landmass); we believe the DTC opportunity in other territories such as the Americas should be greater. But the point is that 225M paid subscribers by 2028 looks more on the aggressive side, and that current valuation at US$97.56/share is hard to back under rational EFCF projections.

(Emphasis in original).

110. On this news, the price of the Company's Class A common stock fell $11.76 or approximately 12.1%, from a closing price of $97.49 per share, to a close at $85.73 per share on January 7, 2026.

***February 11, 2026 Offering Press Release***

111. The truth continued to emerge on February 11, 2026, when the Company issued a press release announcing its intent to offer a $1 billion aggregate principal of convertible senior notes (the "February 2026 Offering Press Release"). The February 2026 Offering Press Release announced the Company's "intent to offer a $1.0 billion aggregate principal of convertible senior notes due 2036 (the 'Notes') in a private offering[.]" The February 2026 Offering Press Release further stated that the Company "also intends to grant the initial purchasers of the Notes . . . an option to purchase . . . up to an additional $150.0 million aggregate principal amount of Notes."

112. The February 2026 Offering Press Release additionally revealed that the proceeds from the private offering would be used for the following, in relevant part:

> [G]eneral corporate purposes, including without limitation, ***accelerating the deployment of our controlled spectrum bands on a global basis, monetizing the capabilities of our proprietary technology to capture the evolving commercial opportunities related to artificial intelligence, enhancing investment in government space opportunities in the U.S., reducing higher interest debt, and pursuing opportunistic investments to accelerate our SpaceMobile Service and***

***capabilities.***

***February 12, 2026 Press Release***

113. On February 12, 2026, the Company issued a press release announcing the pricing of the proposed offering detailed in the February 2026 Offering Press Release. The press release detailed that the convertible senior notes would be offered at "an initial conversion price of approximately $116.30 per share of AST SpaceMobile's Class A common stock, which represents a premium of approximately 20% to the last reported sale price of AST SpaceMobile's Class A common stock on February 11, 2026."

114. On this news, the price of the Company's Class A common stock fell $14.70 or approximately 15.2%, from a closing price of $96.92 per share on February 11, 2026, to a close at $82.22 per share on February 12, 2026. Despite these disclosures, the Individual Defendants continued to obfuscate the truth about the Company's market competitiveness and the sufficiency of its current financial positioning to support its business objectives.

***March 2, 2026 Press Release and Form 10-K***

115. On March 2, 2026, the Company issued a press release reporting its financial results for the fourth quarter and full year of the 2025 fiscal year (the "FY 2025 Press Release"). The FY 2025 Press Release touted the Company's recent achievements and developments including, in relevant part:

> **Reported revenue of $70.9 million for the full year 2025 driven by mobile network operator partners and the U.S. Government**
>
> ***
>
> **Robust balance sheet with over $3.9 billion in cash, cash equivalents, restricted cash and liquidity, pro forma for the convertible notes offering and availability**

> **under the ATM facility (as of December 31, 2025)**

(Emphasis in original).

116. Defendant Avellan is also quoted in the FY 2025 Press Release as stating that the Company "***significantly advanced all key aspects of our operations including commercial, government, manufacturing, spectrum rights, IP portfolio, and capital position***[.]"

117. The same day, the Company filed with the SEC an annual report on Form 10-K for its 2025 fiscal year ("2025 Form 10-K"). The 2025 Form 10-K was signed by Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Rubin, Sarnoff, Torres, and Wibergh. The 2025 Form 10-K also contained SOX certifications, signed by Defendants Avellan and Johnson, which were substantially similar to the SOX certifications contained in the 2024 Form 10-K.

118. Regarding the Company's competitive advantages, the 2025 Form 10-K contained substantially the same statements as those in the 2024 Form 10-K, referenced in ¶ 72.

119. The 2025 Form 10-K further provided assurances about the Company's financial position, stating in relevant part:

> We believe our cash and case equivalents on hand ***will be sufficient to meet our current working capital needs, planned operating expenses and capital expenditures for a period of the next 12 months from the date of this Annual Report.***

***April 28, 2026 Proxy Statement***

120. On April 28, 2026, the Company filed the 2026 Proxy Statement. Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Rubin, Sarnoff, Torres and Wibergh solicited the 2026 Proxy Statement, which contained material misstatements and omissions.

121. The 2026 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Rubin, Sarnoff,

Torres and Wibergh to the Board; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the year ended December 31, 2026; and (3) approve, on an advisory basis, the compensation paid to the Company's named executive officers.

122. Regarding the Company's Code of Conduct and "Corporate Governance Framework", the 2026 Proxy Statement stated the following:

> The Board has adopted a Code of Business Conduct and Ethics (the "Code of Ethics") that, along with the Company's Second Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation"), our Amended and Restated Bylaws ("Bylaws"), the charters of the committees of the Board (the "Committees") and our Amended and Restated Stockholders' Agreement (the "Stockholders' Agreement"), provide the framework for the governance of the Company. Our Code of Ethics applies to all of our directors, executive officers and employees, including our principal executive officer, principal financial officer, principal accounting officer and persons performing similar functions. The Code of Ethics is available on our corporate website at https://investors.ast-science.com. We intend to make any legally required disclosures regarding amendments to, or waivers of, provisions of our Code of Ethics on our website rather than by filing a Current Report on Form 8-K. The charters for all of our Committees as well as our Corporate Governance Guidelines are also available under the "Leadership and Governance" link under the heading "Investors" on our website at https://investors.ast-science.com.

123. Regarding the Company's "Risk Oversight," the 2026 Proxy Statement stated the following:

> Our Board is responsible for overseeing our risk management process. Our Board focuses on our general risk management strategy, the most significant risks facing us, and oversees the implementation of risk mitigation strategies by management. While our Board is ultimately responsible for overseeing our risk management process, certain committees assist our Board in overseeing parts of our overall risk management and regularly report to the Board regarding risk and the related risk management. During fiscal 2025, the Board's Committees assisted with the following responsibilities:
>
> - **Audit Committee**: Reviewing our accounting, reporting and financial practices, including the integrity of our financial statements and the

> oversight of our financial controls; and overseeing the Company's policies with respect to risk assessment and risk management, including overseeing management's implementation and execution of our cybersecurity risk management strategy and processes.
>
> ***
>
> In addition, our Board receives periodic detailed operating performance reviews from management regarding certain risks and related management processes and procedures. The Board believes its current leadership structure enables it to fulfill its risk oversight function.

(Emphasis in original).

124. Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Rubin, Sarnoff, Torres and Wibergh caused the 2026 Proxy Statement to be false and misleading by failing to disclosed, *inter alia*, that: (1) the Company was facing slow user adoption in Japan and the U.S.; (2) the Company's competitive advantage and positioning in the satellite direct-to-cellular market was overstated; (3) the Company lacked the sufficient capital and liquidity to meet strategic product development and business goals; and (4) consequently, the frequency at which the Company would likely require increasing its debt load and share dilution was significantly understated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

125. The 2026 Proxy Statement was also false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2026 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false

and misleading statements.

126. As a result of Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Rubin, Sarnoff, Torres and Wibergh causing the 2026 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) re-elect Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Rubin, Sarnoff, Torres and Wibergh to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) appoint KPMG LLP as the Company's independent registered public accounting firm for the year ending on December 31, 2026; and (3) approve, on an advisory basis, the compensation of AST SpaceMobile's named executives.

***May 11, 2026 Press Release and Form 10-Q***

127. On May 11, 2026, the Company issued a press release reporting its financial results for the first quarter of 2026 (the "Q1 2026 Press Release"). Defendant Avellan is quoted in the Q1 2026 Press Release as stating the following, in pertinent part:

> AST SpaceMobile is accelerating manufacturing, regulatory progress, commercial partnerships, and government programs, ***furthering our position as the only technology positioned to capture the massive direct to device broadband opportunity in full***[.]
>
> ***
>
> ***We have a robust global spectrum portfolio, the industry's largest global commercial ecosystem, and a fortress balance sheet, positioning us for success as we create the space-based cellular broadband market***.

128. The Q1 2026 Press Release additionally highlighted the developments in the Company's financial position, including, in relevant part:

> **Company has the key assets – intellectual property, partnerships, balance sheet cash, access to shared MNO and MSS spectrum, over 500,000 square feet of manufacturing and operations space globally – to build and launch over 100**

**BlueBird satellites to enable global coverage of SpaceMobile Service**

(Emphasis in original).

129. The same day the Company also filed, with the SEC, a quarterly report on Form 10-Q for the first quarter of 2026 (the "Q1 2026 Form 10-Q"), which was signed by Defendants Avellan and Johnson. The Q1 2026 Form 10-Q also contained attached SOX certifications, signed by Defendants Avellan and Johnson, which were substantially similar to the SOX certifications contained in the 2024 Form 10-K.

130. Moreover, the Q1 2026 Form 10-Q provided assurances to the investing public regarding the Company's financial position stating, in relevant part:

> We believe our cash and cash equivalents on ***hand will be sufficient to meet our current working capital needs, planned operating expenses and capital expenditures for a period of the next 12 months from the date of this Quarterly Report.***

131. The statements above, referenced in ¶¶ 115-119, 127-130 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was facing slow user adoption in Japan and the U.S.; (2) the Company's competitive advantage and positioning in the satellite direct-to-cellular market was overstated; (3) the Company lacked the sufficient capital and liquidity to meet strategic product development and business goals; and (4) consequently, the frequency at which the Company would likely require increasing its debt load and share dilution was significantly understated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**<u>The Truth Fully Emerges</u>**

***July 15, 2026 Offering Press Release***

132. The truth fully emerged on July 15, 2026, when the Company published the July 2026 Offering Press Release. The July 2026 Offering Press Release disclosed the Company's "intent to offer … $1.0 billion aggregate principal amount of convertible senior notes due 2034 (the 'Notes') in a private offering[.]" It further added that the Company "intends to grant the initial purchasers of the Notes . . . an option to purchase . . . up to an additional $150 million aggregate principal amount of Notes."

133. The July 2026 Offering Press Release additionally revealed that that the proceeds from the offering would be used for expanding the Company's "universe of growth initiatives," stating, in relevant part:

> ***[T]o pursue an expanding universe of growth initiatives and secure additional access to orbit for its space-based cellular broadband network, including partnerships and/or acquisitions to further vertically integrate its business and mitigate risks associated with third-party launch providers***.

134. The July 2026 Offering Press Release also revealed that "***AST SpaceMobile currently does not have any understandings or agreements with respect to any such strategic transactions***."

135. Later the same day, the Company issued another press release to announce the pricing of the above private offering, stating in relevant part:

> $1.0 billion 1.625% convertible senior notes due 2034, which have an initial conversion price of approximately $79.57 per share of AST SpaceMobile's Class A common stock, which represents a premium of approximately 20.0% over the last reported sale price of AST SpaceMobile's Class A common stock on July 15, 2026.

> Capped call transactions entered into in connection with the pricing of the Notes have an initial cap price of $149.20 per share of AST SpaceMobile's Class A common stock, which represents a premium of 125.0% over the last reported sale price of AST SpaceMobile's Class A common stock on July 15, 2026

136. On this news, the price of the Company's Class A common stock fell $11.30 or approximately 17.0%, from a closing price of $66.31 per share on July 15, 2026, to close at $55.01 per share on July 16, 2026.

**<u>DAMAGES TO AST SPACEMOBILE</u>**

137. As a direct and proximate result of the Individual Defendants' misconduct, AST SpaceMobile has lost and expended, and will continue to lose and expend, many millions of dollars.

138. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

139. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

140. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

141. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached

their fiduciary duties to the Company.

142. As a direct and proximate result of the Individual Defendants' conduct, AST SpaceMobile has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

143. Plaintiff brings this action derivatively and for the benefit of AST SpaceMobile to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of AST SpaceMobile, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of the Exchange Act.

144. AST SpaceMobile is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

145. Plaintiff is, and has continuously been at all relevant times, a shareholder of AST SpaceMobile. Plaintiff will adequately and fairly represent the interests of AST SpaceMobile in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

146. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

147. A pre-suit demand on the Board of AST SpaceMobile is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten individuals: Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Rubin, Sarnoff, Torres, and Wibergh (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of ten Director-Defendants who are on the Board at the time this action is commenced.

148. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

149. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted AST SpaceMobile to issue materially false and misleading statements. Specifically, the Director-Defendants caused the Company to issue false and misleading statements which were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

150. Additional reasons that demand on Defendants Ibbetson, Knapp, and Larson is futile follow. Defendants Ibbetson, Knapp, and Larson were nominated to the Board pursuant to the Stockholders' Agreement. On June 5, 2024, and later amended on February 5, 2025, certain

Company stockholders including Defendant Avellan, Vodafone Ventures Limited ("Vodafone"), ATC TRS II LLC ("American Tower"), AT&T Venture Investments, LLC ("AT&T"), and Rakuten Mobile Inc., entered into the Stockholders' Agreement. The Stockholders' Agreement granted Vodafone, American Tower, and AT&T with the right to one nominate a director to the Board. In this regard, Defendant Ibbetson was nominated by Vodafone, Defendant Knapp was nominated American Tower, and Defendant Larson was nominated by AT&T. Thus, as the Company admits, Defendants Ibbetson, Knapp, and Larson are not independent.

151. In addition, the Director-Defendants caused the October 2025 Proxy Statement to call for a shareholder vote to approve of the Amended 2024 Plan. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the Amended 2024 Plan who would not have approved of the Amended 2024 Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the Amended 2024 Plan at a special meeting of the stockholders of AST SpaceMobile on November 21, 2025, the previously existing plan only was to set to expire on July 29, 2034. For this reason, the Individual Defendants, including the Director-Defendants received material personal benefits that they otherwise would not receive but for from the issuance of the false and misleading October 2025 Proxy Statement and the shareholders approving the Amended 2024 Plan that made an additional 10,000,000 shares available under the 2024 Plan. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

152. Additional reasons that demand on Defendant Avellan is futile follow. Defendant Avellan founded the Company in 2017. He has served as the Company's CEO and as a Chairman of the Board since April 2021. He is also a member of the Network Planning and Spectrum

Committee. The Company provides Defendant Avellan with his primary occupation, for which he receives handsome compensation. Moreover, Defendant Avellan is the Company's controlling shareholder. Thus, as the Company admits, he is not an independent director. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. During the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Additionally, Defendant Avellan signed the false and misleading 2024 and 2025 Form 10-Ks referenced herein. Defendant Avellan also solicited the April 2025 Proxy Statement and the 2026 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants, including himself, to the Board which allowed them to continue to breach their fiduciary duties to the Company. Defendant Avellan also solicited the October 2025 Proxy Statement which contained false and misleading statements and contributed to the approval of the Amended 2024 Plan. Defendant Avellan is eligible to receive stock awards under the Amended 2024 Plan, thereby materially benefiting from the adoption of the Amended 2024 Plan. Defendant Avellan is also a defendant in the Securities Class Action. For these reasons, too, Defendant Avellan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153. Additional reasons that demand on Defendant Johnson is futile follow. Defendant Johnson has served as a Company director since January 2025 and as the Company's CLO and CFO since May 2024 and June 2024, respectively. The Company provides Defendant Johnson

with his primary occupation, for which he receives handsome compensation. Thus, as the Company admits, he is not an independent director. As a trusted officer and director, Defendant Johnson conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Defendant Johnson also signed the false and misleading 2024 and 2025 Form 10-Ks. Defendant Johnson also solicited the April 2025 Proxy Statement and the 2026 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants, including himself, to the Board which allowed them to continue to breach their fiduciary duties to the Company. Defendant Johnson also solicited the October 2025 Proxy Statement which contained false and misleading statements and resulted in shareholder approval of the Amended 2024 Plan. Defendant Johnson is eligible to receive stock awards under the Amended 2024 Plan, thereby materially benefiting from the adoption of the Amended 2024 Plan. Further, Defendant Johnson's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the schemes. Moreover, Defendant Johnson is a defendant in the Securities Class Action. For these reasons, too, Defendant Johnson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154. Additional reasons that demand on Defendant Ibbetson is futile follow. Defendant

Ibbetson has served as a Company director since April 2021. He also serves as a member of the Network Planning and Spectrum Committee. Defendant Ibbetson was nominated to the Board pursuant to the Stockholders' Agreement. Thus, as the Company admits, he is not an independent director. As a trusted director, Defendant Ibbetson conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Ibbetson also signed the false and misleading 2024 and 2025 Form 10-Ks. Defendant Ibbetson also solicited the April 2025 Proxy Statement and the 2026 Proxy Statement, which contained false and misleading statements, and contributed to the re-election of the Director-Defendants, including himself, to the Board which allowed them to continue to breach their fiduciary duties to the Company. Defendant Ibbetson also solicited the October 2025 Proxy Statement which contained false and misleading statements and resulted in shareholder approval of the Amended 2024 Plan. Moreover, Defendant Ibbetson is eligible to participate under the Amended 2024 Plan, therefore materially benefitting from its approval. For these reasons, Defendant Ibbetson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155. Additional reasons that demand on Defendant Cisneros is futile follow. Defendant Cisneros has served as a Company director since April 2021. She also serves as Chair of the Compensation Committee, Chair of the Redemption Election Committee, and as a member of the Nominating and Corporate Governance Committee. As a trusted company director, Defendant

Cisneros conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. Defendant Cisneros also signed the false and misleading 2024 and 2025 Form 10-Ks. Defendant Cisneros also solicited the April 2025 Proxy Statement and the 2026 Proxy Statement, which contained false and misleading statements and contributed to the re-election of the Director-Defendants, including herself, to the Board which allowed them to continue to breach their fiduciary duties to the Company. Defendant Cisneros also solicited the October 2025 Proxy Statement, which contained false and misleading statements and resulted in shareholder approval of the Amended 2024 Plan. Moreover, Defendant Cisneros is eligible to participate under the Amended 2024 Plan, therefore materially benefiting from its approval. For these reasons, too, Defendant Cisneros breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

156. Additional reasons that demand on Defendant Knapp is futile follow. Defendant Knapp has served as a Company director since April 2021. He also serves as a member of the Network Planning and Spectrum Committee. Defendant Knapp was nominated to the Board pursuant to the Stockholders' Agreement. Thus, as the Company admits, he is not an independent director. As a trusted company director, Defendant Knapp conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and

consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Knapp also signed the false and misleading 2024 and 2025 Form 10-Ks. Defendant Knapp also solicited the April 2025 Proxy Statement and the 2026 Proxy Statement, which contained false and misleading statements and contributed to the re-election of the Director-Defendants, including himself, to the Board which allowed them to continue to breach their fiduciary duties to the Company. Defendant Knapp also solicited the October 2025 Proxy Statement which contained false and misleading statements and resulted in shareholder approval of the Amended 2024 Plan. Moreover, Defendant Knapp is eligible to participate under the Amended 2024 Plan, therefore materially benefiting from its approval. For these reasons, too, Defendant Knapp breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157. Additional reasons that demand on Defendant Larson is futile follow. Defendant Larson has served as a Company director since January 2025. He also serves as a member of the Network Planning and Spectrum Committee. Defendant Larson was nominated to the Board pursuant to the Stockholders' Agreement. Thus, as the Company admits, he is not an independent director. As a trusted company director, Defendant Larson conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Larson also signed the false and misleading 2024 and 2025 Form 10-Ks. Defendant Larson also solicited

the April 2025 Proxy Statement and the 2026 Proxy Statement, which contained false and misleading statements and contributed to the re-election of the Director-Defendants, including himself, to the Board which allowed them to continue to breach their fiduciary duties to the Company. Defendant Larson also solicited the October 2025 Proxy Statement which contained false and misleading statements and resulted in shareholder approval of the Amended 2024 Plan. Moreover, Defendant Larson is eligible to participate under the Amended 2024 Plan, therefore materially benefiting from its approval. For these reasons, too, Defendant Larson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158. Additional reasons that demand on Defendant Rubin is futile follow. Defendant Rubin has served as a Company director since April 2021. He also serves as a member of the Audit Committee. As a trusted company director, Defendant Rubin conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Rubin also signed the false and misleading 2024 and 2025 Form 10-Ks. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Rubin also solicited the April 2025 Proxy Statement and the 2026 Proxy Statement, which contained false and misleading statements and contributed to the re-election of the Director-Defendants, including himself, to the Board which allowed them to continue to breach their fiduciary duties to the Company. Defendant Rubin also solicitated the October 2025 Proxy Statement which contained false and misleading statements and resulted in shareholder approval of the Amended 2024 Plan. Defendant Rubin is

eligible to participate under the Amended 2024 Plan, therefore materially benefiting from its approval. For these reasons, Defendant Rubin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159. Additional reasons that demand on Defendant Sarnoff is futile follow. Defendant Sarnoff has served as a Company director since April 2021. He also serves as Chair of the Nominating and Corporate Governance Committee. As a trusted company director, Defendant Sarnoff conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Sarnoff also signed the false and misleading 2024 and 2025 Form 10-Ks. Defendant Sarnoff also solicited the April 2025 Proxy Statement and the 2026 Proxy Statement, which contained false and misleading statements and contributed to the re-election of the Director-Defendants, including himself, to the Board which allowed them to continue to breach their fiduciary duties to the Company. Defendant Sarnoff also facilitated the October 2025 Proxy Statement which contained false and misleading statements and resulted in shareholder approval of the Amended 2024 Plan. Moreover, Defendant Sarnoff is eligible to participate under the Amended 2024 Plan, therefore materially benefiting from its approval. For these reasons, Defendant Sarnoff breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160. Additional reasons that demand on Defendant Torres is futile follow. Defendant Torres has served as a Company director since April 2021. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. As a trusted company director, Defendant Torres conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Torres also signed the false and misleading 2024 and 2025 Form 10-Ks. Defendant Torres also solicited the April 2025 Proxy Statement and the 2026 Proxy Statement, which contained false and misleading statements and contributed to the re-election of the Director-Defendants, including himself, to the Board which allowed them to continue to breach their fiduciary duties to the Company. Defendant Torres also facilitated the October 2025 Proxy Statement which contained false and misleading statements and resulted in shareholder approval of the Amended 2024 Plan. Moreover, Defendant Torres is eligible to participate under the Amended 2024 Plan, therefore materially benefiting from its approval. Further, Defendant Torres' insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the schemes. For these reasons, Defendant Torres breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161. Additional reasons that demand on Defendant Wibergh is futile follow. Defendant Wibergh has served as a Company director since June 2024. He also serves as Chair of the Network

Planning and Spectrum Committee and as a member of the Audit Committee and the Compensation Committee. As a trusted company director, Defendant Wibergh conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Wibergh also signed the false and misleading 2024 and 2025 Form 10-Ks. Defendant Wibergh also solicited the April 2025 Proxy Statement and the 2026 Proxy Statement, which contained false and misleading statements and contributed to the re-election of the Director-Defendants, including himself, to the Board which allowed them to continue to breach their fiduciary duties to the Company. Defendant Wibergh also solicited the October 2025 Proxy Statement which contained false and misleading statements and resulted in shareholder approval of the Amended 2024 Plan. Moreover, Defendant Wibergh is eligible to participate under the Amended 2024 Plan, therefore materially benefiting from its approval. For these reasons, too, Defendant Wibergh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162. Additional reasons that demand on the Board is futile follow.

163. Defendants Torres (as Chair), Rubin, and Wibergh (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for overseeing the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by

engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

164. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

165. AST SpaceMobile has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for AST SpaceMobile any part of the damages AST SpaceMobile suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

166. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

167. The acts complained of herein constitute violations of fiduciary duties owed by AST SpaceMobile's directors and/or officers, and these acts are incapable of ratification.

168. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of AST SpaceMobile. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of AST SpaceMobile, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the

Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

169. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause AST SpaceMobile to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

170. Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

171. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

172. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

173. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

174. Under the direction and watch of Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres, and Wibergh, the April 2025 Proxy Statement failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the April 2025 Proxy Statements' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

175. The April 2025 Proxy Statement also failed to disclose that: (1) the Company was facing slow user adoption in Japan and the U.S.; (2) the Company's competitive advantage and positioning in the satellite direct-to-cellular market was overstated; (3) the Company lacked the sufficient capital and liquidity to meet strategic product development and business goals; and (4) consequently, the frequency at which the Company would likely require increasing its debt load and share dilution was significantly understated. As a result, the Company's public statements were materially false and misleading at all relevant times.

176. In exercise of reasonable case, Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres, and Wibergh should have known that by misrepresenting or failing to disclose the foregoing material facts, that statements contained in the April 2025 Proxy Statement were materially false and misleading. The misrepresentations and

omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the April 2025 Proxy Statement, including but not limited to, the re-election of the Director-Defendants.

177. As a result of Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres, and Wibergh causing the April 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres, and Wibergh to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) appoint KPMG LLP as the Company's independent registered public accounting firm for the year ended December 31, 2025; (3) approve an amendment to the Company's Second Amended and Restated Certificate of Incorporation permitting Company stockholders to take action, by written consent, for the purpose of removing directors; (4) approve, on an advisory basis, the compensation of AST SpaceMobile's named executives; and (5) approve, on an advisory basis, future advisory votes at a frequency of one year, on the compensation of AST SpaceMobile's named executives.

178. Under the direction and watch of Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres, and Wibergh, the October 2025 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company was facing slow user adoption in Japan and the U.S.; (2) the Company's competitive advantage and positioning in the satellite direct-to-cellular market was overstated; (3) the Company lacked the sufficient capital and liquidity to meet strategic product development and business goals; and (4) consequently, the frequency at which the Company would likely require increasing its debt load and share dilution was significantly

understated. As a result, the Company's public statements were materially false and misleading at all relevant times.

179. In exercise of reasonable case, Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres, and Wibergh should have known that by misrepresenting or failing to disclose the foregoing material facts, that statements contained in the April 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the October 2025 Proxy Statement, including but not limited to, the re-election of the Amended 2024 Plan.

180. As a result of Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres, and Wibergh causing the October 2025 Proxy Statement to be false and misleading, Company shareholders voted to approve the Amended 2024 Plan.

181. Under the direction and watch of Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Rubin, Sarnoff, Torres, and Wibergh, the 2026 Proxy Statement failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2026 Proxy Statements' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

182. The 2026 Proxy Statement also failed to disclose that: (1) the Company was facing slow user adoption in Japan and the U.S.; (2) the Company's competitive advantage and

positioning in the satellite direct-to-cellular market was overstated; (3) the Company lacked the sufficient capital and liquidity to meet strategic product development and business goals; and (4) consequently, the frequency at which the Company would likely require increasing its debt load and share dilution was significantly understated. As a result, the Company's public statements were materially false and misleading at all relevant times.

183. In exercise of reasonable case, Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Mikitani, Rubin, Sarnoff, Torres, and Wibergh should have known that by misrepresenting or failing to disclose the foregoing material facts, that statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, the re-election of the Director-Defendants.

184. As a result of Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Rubin, Sarnoff, Torres and Wibergh causing the 2026 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) re-elect Defendants Avellan, Johnson, Cisneros, Ibbetson, Knapp, Larson, Rubin, Sarnoff, Torres and Wibergh to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) appoint KPMG LLP as the Company's independent registered public accounting firm for the year ending on December 31, 2026; and (3) approve, on an advisory basis, the compensation of AST SpaceMobile's named executives.

185. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the April 2025, October 2025, and 2026 Proxy Statements.

186. Plaintiff, on behalf of AST SpaceMobile, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

187. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AST SpaceMobile business and affairs.

189. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

190. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AST SpaceMobile.

191. In breach of their fiduciary duties owed to AST SpaceMobile, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was facing slow user adoption in Japan and the U.S.; (2) the Company's competitive advantage and positioning in the satellite direct-to-cellular market was overstated; (3) the Company lacked the sufficient capital and liquidity to meet strategic product development and business goals; and (4) consequently, the frequency at which the Company would likely require increasing its debt load and share dilution was significantly understated. As a result, the Individual Defendants' statements made throughout the Relevant Period lacked a reasonable basis at all times.

192. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

193. Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls while three of the Individual Defendants engaged in improper insider sales, netting total proceeds of approximately $277.4 million.

194. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AST SpaceMobile's securities.

195. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or

recklessly and for the purpose and effect of artificially inflating the price of AST SpaceMobile's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

196. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

197. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AST SpaceMobile has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

198. Plaintiff, on behalf of AST SpaceMobile, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

199. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

200. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, AST SpaceMobile.

201. The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from AST SpaceMobile that was tied to the performance or artificially inflated valuation of AST SpaceMobile or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes lavish

compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

202. Plaintiff, as a shareholder and a representative of AST SpaceMobile, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

203. Plaintiff, on behalf of AST SpaceMobile, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

204. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

205. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence AST SpaceMobile, for which they are legally responsible.

206. As a direct and proximate result of the Individual Defendants' abuse of control, AST SpaceMobile has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

207. Plaintiff, on behalf of AST SpaceMobile, has no adequate remedy at law.

## FIFTH CLAIM

**Against the Individual Defendants for Gross Mismanagement**

208. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of AST SpaceMobile in a manner consistent with the operations of a publicly-held corporation.

210. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, AST SpaceMobile has sustained and will continue to sustain significant damages.

211. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

212. Plaintiff, on behalf of AST SpaceMobile, has no adequate remedy at law.

## SIXTH CLAIM

**Against the Individual Defendants for Waste of Corporate Assets**

213. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

214. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

215. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused AST SpaceMobile

to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

216. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

217. Plaintiff, on behalf of AST SpaceMobile, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Avellan and Johnson for Contribution Under Sections 10(b) and 21D of the Exchange Act

1. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

2. AST SpaceMobile and Defendants Avellan and Johnson are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Avellan's and Johnson's willful and/or reckless violations of their obligations as controlling shareholders, officers, and/or directors of AST SpaceMobile.

3. Defendants Avellan and Johnson, because of their positions of control and authority as controlling shareholders, officers, and/or directors of AST SpaceMobile, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of AST SpaceMobile, including the wrongful acts complained of herein and in the Securities Class Action.

218. Accordingly, Defendants Avellan and Johnson are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

219. As such, AST SpaceMobile is entitled to receive all appropriate contribution or indemnification from Defendants Avellan and Johnson.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of AST SpaceMobile, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to AST SpaceMobile;

(c) Determining and awarding to AST SpaceMobile the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing AST SpaceMobile and the Individual Defendants to take all necessary actions to reform and improve AST SpaceMobile's corporate governance and internal procedures to comply with applicable laws and to protect AST SpaceMobile and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper

corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of AST SpaceMobile to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding AST SpaceMobile restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: October 21, 2026

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Saadia Hashmi*
Saadia Hashmi (TX# 24139546)
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Telephone: (516) 922-5427
Facsimile: (516) 344-6204

Email: shashmi@thebrownlawfirm.net

*Counsel for Plaintiff*

Docusign Envelope ID: 5B4DE22E-F1F5-829E-806D-36002759C217


**VERIFICATION**

I, Arthur Papa, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 20th day of October 2026.

Signed by:

B2C9FA807FD8441...

Arthur Papa